2017-2599. Mr. Hogan. Thank you, Ron. This is also a Navy case involving NAVAC. RDA Construction Corp. was a contractor. We go up to Newport, Rhode Island, at the Navy base, where a pier and a facility was to be demolished. RDA believes that reversible error was made in a number of areas in the decision, in particular, starting with superior knowledge. The major four elements that are required in superior knowledge are articulated in a host of cases. Hercules is required for a superior knowledge case, are that the contractor undertook to perform without vital knowledge of a fact that affects performance, cost, or direction. The government was aware the contractor had no knowledge of and had no reason to obtain such information. Three, any contract specification supplied misled the contractor or did not put it on notice to inquire. And four, the government failed to provide the relevant information. The court found that RDA did satisfy Elements 1 and Elements 2 when RDA took to undertake the project without what's so-called Appledore Report, a 2005 engineering study. I thought it was Elements 1 and 4. I'm sorry, yeah, 1 and 4. It was 2 that's a big problem, right? Two, the government believes that the contractor had no reason to obtain such information, but that is refuted, Your Honor, because even with the Appledore Report, NAVVAC takes the engineer and says, hey, go out and take a look to see if we can use that wharf during construction. And that's the so-called FST Report, Appendix 1816. And that report was said, even with this report, I want to know if we can use that wharf because it makes a lot of sense. It makes construction much more efficient. As with the contractors. Contractors didn't have that report, but all of them would have wanted to use that. There were five bidders on this. None of them asked any questions about the condition of the wharf. And I think the decision makes a mistake by talking about In your bid, did you make it clear that you needed to have access to the wharf? I didn't request that. For purposes of the equipment? No. There was a form bid where you filled out prices and you just put it in. After the bids were taken, there was a request from NAVVAC that RDA disclose its means and methods, how it was going to do the demolition. And in those means and methods, it said that it would be using the wharf. Once you put on notice that something must be amiss when they said the price is way too low? No. You would think somebody logical would go back and say, what do you know that we don't know? It's an interesting question. Actually, RDA Construction has been in business for a long time. Two of the other bidders were his cousins. He actually worked for one of the other contractors. One of the contractors finished a $400 million contract for the artery, was dredging. They're qualified contractors. They all know what they're doing. Mr. Kelly did testify that, yes, I dropped some numbers to get some work. But he didn't expect that he would have to pull each pile the way it happened. And, Your Honor, as we know, there are 25 of those piles still in the ocean. What RDA wanted to do, have them cut off, is what ultimately happened. And FST, the design engineer, when it became so difficult to pull up these piles, the Navy asked, do we need to do that? Do we really have to pull them? He said no. But they didn't present that evidence to RDA. They said, no, you pull them in their entirety. Three years went by and three million more dollars that the bonding company spent to try to pull those piles, and they couldn't be pulled. And the contractor they were using, Your Honor, the contractor they were using that was Regan Construction. Regan Construction is right next door to this facility. He was the one, if you look at the pictures with the jackets, he was the one that worked on this wharf and put the jackets on it. What does this have to do, though, with the factors that you were just talking about, including whether the government was aware that the contractor had no knowledge of and had no reason to obtain the information about whether the pier could hold equipment? The real issue was the piles, not the wharf. The judge talks about holes, and the real issue was the 248 piles and the condition of them. And what the report said was that you couldn't see them unless you dove under the water. And even the contracting officer who testified in this case said, I wouldn't have allowed a diving investigation. And the Appledore report was a level three. They tore apart the organic growth and looked at that. So no bidder was, A, going to be allowed to do that, and B, it wasn't costly or... Well, what specifically do you think was wrong with the Court of Federal Claims' findings of fact with respect to factor number two? That it was reasonable to believe that you could use the wharf and that the condition of the wharf on its face looked good. Even the FST report and even the Appledore report said that if you looked at the wharf, it looked fine. The problem was that... So you're saying that the Court of Federal Claims' finding that it wasn't reasonable to think it looked fine was wrong? Yes. But it would have to be clearly erroneous, would it not? Yes. And I think it's clearly erroneous because even knowing what they knew, the NAVAC engineers asked for another study. And so that shows you what the engineering staff was thinking. Well, that has to do with the superior knowledge, the first point. Yes. And the Court of Federal Claims clearly found that the government had superior knowledge and withheld material information. But they said, but you had reason to know essentially the facts that they knew. But the Court was focusing on things that didn't really go to the real problem. And that's what I'm trying to get to. I'm sorry. I'm sorry, Your Honor. The real problem is not only were these piles deteriorated, they were deteriorated below the mud line. And that never happens. That never really ever happens. Literally, Regan Construction went in there and they had divers go down and dig these holes and try to attach underneath the dirt and they couldn't pull it. Where's the evidence in the record that says it never happens? What do you mean it never happens? That you as a contractor would never... I think it was testimony of Mr. Kelly that it was highly unusual. I think the testimony of Mr. Ahern, who was the Regan guy, said it was unusual. And in Haskell Construction, the successor contractor, who took almost $3 million to do this and couldn't get it done. And the third prong, Your Honor, about superior knowledge is the Hercules case says if any of the specs say that it misleads you, and we show in our brief at Section 3.11 the demo spec said, place your demo equipment on the structure so as to be able to not create too much of a load. And during the trial, Mr. Helms, I asked him what structure were they referring to? And he said he assumed the wharf. And we didn't discuss what types of equipment. And he said, yeah, it would be demolished equipment, trailers, that kind of thing. So that was misleading. Okay? And that meets Hercules' third prong. So we believe that all four prongs were clearly evident. We argued that it was a cardinal change. Why was it a cardinal change? It was a cardinal change because it was impossible to do. The Court refers to the Spearing case and says that a contractor can't be compensated for something that's possible to do. We say that this was impossible to do. You had Regan Construction, who had worked for the Navy before. He was unable to do this. Three million dollars had been spent trying to do it, and they decided not to do it. So we believe that was a cardinal change. Can I ask you something? Go ahead. The Court of Federal Claims thought your only cardinal change argument related to picking up debris from the piles off the ocean floor. Is that what you're saying was impossible to do, or was the rest of the work impossible? No, because of what the Appledore Report was saying, that these piles are toast. They are gone. Every single one had to have this enormous amount of effort, people underwater with welding, doing stuff,  and then in the end, it was impossible to do. And what RDA said was, we'll cut them off for nothing. And the government said no. And the government paid $500,000 for Regan to cut the 125. So there was a lot going on in this contract and how it was managed. But we believe having that Appledore Report and not disclosing it, and then going out and trying to get your own, and not disclosing that either. The Navy didn't talk about any of those reports. So is it your position that, with respect to the impossibility, that it shouldn't have been a termination for default, and therefore there should be no liquidated damages? Or are you saying that the government owes you money? Well, certainly we believe we shouldn't have been terminated, because we were terminated for two causes. One was time, and I think we showed you that we were owed 313 more days because we had 198 days to do stuff after we were done with the drilling that was an extra. So time was really a flaw. And then second, we were telling them that these can't be pulled. It took them three years to find out, and $3 million that was attached to my client, because the bonding company chased in for that $300 million. Mr. Stoll, did you have a question? No, actually. I'll reserve my time for rebuttal. It wasn't $300 million. It was $3 million, right? Yeah. Okay. You said $300, I think. I'm sorry. That's okay. My first rodeo here. Yeah, I'm thinking the money is getting bigger and bigger as we go along. May it please the Court. After hearing all of the evidence, the trial judge found that RDA had not proven any of its claims. RDA asks this Court to- But the Court did find that the government withheld material information and did have superior knowledge with respect to very important facts, right? Sort of. The Court should not have found. The Court did find that two of the four elements of the superior knowledge doctrine were met. The Court should not have found that any of the elements were met. But in any case- How could you not disclose these reports? I don't even understand it. So there were a number of reasons for why the Navy had no recognition that a contractor would think that it could use this existing wharf in the manner that RDA afterward alleged that it previously planned to do. You say that, but you actually had two reports, including one underwater analysis, that you knew the contractors didn't have the ability to do. So why didn't you just give them that and let them know up front, oh, by the way, when you're bidding, you're not going to be able to use this wharf? And so the contract did say that. The contract's terms made clear that the existing wharf had to be demolished as the first item of work. And so an idea that I was going to use that wharf to do new construction was inconsistent with the contract terms. In other words, the designer designed a project in which the wharf could not be used. Furthermore, as the Court recognized, including several photographs, it was obvious from a visual inspection of the site that one could not just assume that this structure was in good condition and was capable of withstanding 75,000-pound equipment exerting operating loads on it after it was partially cut away. We presented expert testimony. Do you agree that ultimately the job was impossible to do? No, that's incorrect. And there are two separate issues that are being discussed here. There's the removal of the piles, and that's really a separate issue from the superior knowledge claim as has been presented throughout this litigation. The removal of piles was not impossible. So, for example, on page 41 of our brief, we cite to a number of testimony where both the completion contractor and RDA was capable of removing the piles. It was extremely difficult, but only after RDA created that condition by reckless demolition. RDA snapped off the piles. So rather than leaving the steel for these piles that supported the old wharf, rather than leaving them high in the water and taking care in the demolition to leave them so that something called a vibratory extractor could be clamped on securely, vibrate the entire element to break the friction with the earth and then lift the whole thing out, rather than leave those sticking up above water, RDA used its crane in a manner it shouldn't have to just recklessly demolish the top of this structure. And what it left were, according to the dive reports that were provided or were conducted after the termination, on the bottom there were mangled, twisted, damaged pieces of these old steel piles. At that point, it was extremely difficult to go down, in many cases, first remove all sorts of debris that had also been dropped down there, remove that, clear the way, locate the pile, sometimes expose, dig down, basically move the soil in order to get clean steel to then attach this extractor now underwater. So you're saying none of that was down there before RDA started the work? Correct, and we know that because we can compare the hydrographic survey from before the work was done, in which there's a clean, smooth bottom, and we presented the expert testimony of Nancy Byrne, who did a hydrographic survey on this project before the project was started, and then after the termination. And after the termination, there was all of this debris found. Not only that hydrographic survey, there were dive reports conducted which revealed all of this debris, mounds of debris, that had been dropped down there. So going back to this issue of extracting the piles, it was a condition that RDA created for itself. And another way in which that was shown was that some of the piles were less damaged than others when the completion contractor went out there to try to remove them. And those ones that had clean steel sticking up higher in the water, the government's construction manager testified, were coming out with relative ease, very different than those that were most mangled and had been damaged. It's true that ultimately after the completion contractor made efforts, the Navy did not require every single pile to be removed. Many were approximately half were left in place under a settlement that occurred between the completion contractor, the surety, and the government. But this was a condition, again, this was a condition that RDA created for itself. It submitted a demolition plan to the government in which it chose to do this. It told the government, we're going to break the piles off and then we're going to send a diver down there to attach the vibratory hammer underwater to extract these. This was its approved demolition plan. And RDA did not follow through on the second part of that plan. Wasn't the government on notice when they saw how low the bid was, that there had to have been some information they didn't fully understand? The government was concerned about that and specifically wrote to RDA to check their bid. Right, I understand that. But when RDA said, no, we think this is right, maybe you should have said, why don't we show you this Appledore and FTS report because we think it can't be right. But when the government asked RDA, how are you going to do the work? And RDA submitted a technical plan. This is Appendix 3346. RDA again remained silent. It hadn't asked questions pre-award because it didn't, or pre-bid because it didn't want to reveal its thinking. It said, now it was the presumptive awardee and it still remained completely silent about any plan to use the wharf. Instead, it wrote to the Navy, again on Appendix 3346, that it's going to be performing the work from the land side and the water side, saying nothing about possibly using the wharf. How do you perform from the land side without using the wharf? And RDA did. It's relatively large equipment that's being used, for example, a crane that has substantial reach, so the crane can be placed on the land side and reach over the water, and that happened. So there's no problem with that necessarily. And furthermore, the pre-award technical plan said that RDA was going to be using a barge. Later, after the project was actually awarded, RDA's project manager, someone different who prepared the bid, which said we're going to use barges and we're going to have crews on water for demolition, and that's at Appendix 3301. RDA's project manager came in, developed a new demolition concept, and his concept was we're going to get on that old wharf and try to work from there. That wasn't what the bid was actually based on, and so the superior knowledge doctrine, none of these elements should have been met. It fails from the premise. It wasn't proven that there was actually any variance from the bid. Where did the liquidated damages numbers come from? The liquidated damages numbers were the contractually agreed rate based on the number of days that the Navy claimed liquidated damages were, and there were two periods. There was the period from the final contract completion date for RDA's contract, which was extended from the original date by 467 days. Did they still have some time left? No. The default termination was approximately four months after the final contract completion date was amended. The final contract completion date was October of 2012, and the termination was February 21st. Was the government actually out of pocket any money? The government was out of pocket substantial money because the government continued to pay the contract balance. To clarify, it's true that the surety came in and paid much of the difference there, but there was a lot of work that was ultimately deleted from this project and handled in a separate Coast Guard project, but the government still committed the full remaining contract balance, which had been increased into the $8 million range. When you said the government had a much higher estimate for what this contract was likely to be, what was that estimate? It was approximately $8.7 million, I believe. There's a bid abstract in the appendix, which you can find if the court wants it. The government's estimate was $8.7 million? Both the next lowest bid and the government's estimate was between, I believe, $8.5 and $9 million. The next highest bid, I remember, was approximately 20% higher than RDA's bid, and the government's independent estimate was a similar price. As to the request for a time extension, there was only a single time extension request made, and it just was not logical. It wasn't based on a coherent theory of excusable delay. The idea that the project isn't done is not sufficient reason for an extension, but that was basically the theory that was presented. The only scheduling expert who conducted an analysis in which he looked at the causes and responsibility for the delays concluded that no additional time extension beyond that 467 days that had already been granted by the Navy, no additional time extension could be justified for any reason in this case. As to the default termination, the default termination would be upheld if RDA was in default for any reason, and it was in default for several reasons. Both of the bases that the court looked at were justified, that is, the failure to complete the project within the time allowed, and anticipatorily repudiating the obligation to remove the piles. That obligation was in the contract from the beginning, and RDA flatly said it wasn't going to do the work unless it was paid another million dollars. In addition, what really precipitated the default was that the project basically came to a standstill. Equipment was broken, and it wasn't being repaired. It was a saga of broken promises and missed milestones as far as repairing the equipment, and the major equipment just sat there broken during the final months of the project. So basically no progress was occurring. A day would pass, and the project wouldn't get any closer to completion. As the government's witnesses testified, it got to the point at which the Navy felt that no additional time would have resulted in successful completion, and the default termination occurred then. For these reasons, we respectfully request that the court affirm the judgment of the court federal claims. Thank you, Mr. Volk. Mr. Hogan has some rebuttal time left. Thank you, Your Honor. Three and a half minutes, if you need it. Following up on my brother's reference to wrongful termination, it's our position, I think, and it's clear in the papers, that the modifications, sometimes it would take them six months to make a mod, and then they would put the new time back in the time that they took to make the decision. So, you know, we'd be in October, and they'd say, okay, you've got until June now. So we couldn't do anything while we were waiting on those modifications. Second of all, it wasn't that RDA said that, if you heard his argument correctly, wouldn't pull the piles. They were out there pulling the piles, and they said they wanted to do it for a million dollars. Ultimately, it took $3 million, and they didn't wind up pulling all the piles. There's 125 out of the 248 that are still in there. RDA pulled approximately 40, and some of them did go easy, but a lot of them did not go easy. And my brother talked about the snap-off. RDA didn't cause the problem with the piles. If you turn to Appendix 872, you'll see Mr. O'Hearn, who was down there and supervising the divers and the equipment, and he worked for Regan. He was one of the bidders, and his company was right next to this cove. He testifies that while the divers would go down to the pile, excavate material around the pile until they could get a section of pile that was relatively sound. Then they'd cut off the upper portion of the pile, however much that needed to be. It could be a matter of inches. It could be a matter of a couple of feet, until there was a clear, clean section of pile. Then they'd put the vibratory extractor on it, clamp onto it, start the vibration, put a strain on it with the crane, and it would shake the pile and vibrate it, and it would start to come up. That was the mode to pull these piles. You should have been able to do that from a barge, from above water. But because of these conditions of the piles, it couldn't. Some of the piles would break off either just below the vibratory hammer or as far down as below the mud line. That's the unusual circumstance I'm talking about. You don't see steel in the dirt snap off. Then we'd either cut them again and clamp on them and dig more if needed and clamp on, and this went on and on and on and on. Sometimes they would spend a week on one or two piles until finally, since we don't need to have these out, we just wanted to cut them off. Just like RDA said, and RDA was willing to try to pull them off for a million dollars, he got terminated. We got terminated. And then I think that we got terminated for being late, and we weren't late. We were falling apart. I think the impossibility of the pulling of the piles made for a cardinal change, and that's what RDA was seeking in its letter for cardinal change, was asking for some direction, asking for some more funds to do that. And that did not happen. The court also referenced something about the FAR and how we made some, we were obliged to do some kind of inspection, but that's a reasonable inspection. The FAR that the government relies on talks about a reasonable inspection, and having an underwater engineering study was not a reasonable inspection. So we don't believe that that FAR portion. Well, what about the fact that the contract itself said the first thing that has to be done is that the wharf has to be demolished? Well, that was a sequence of events, and RDA was working to do that, but RDA wasn't intending on having the whole wharf stay up. They were going to request to stay, to keep a piece of it up. And that's not unreasonable when you think about what the NAVAC engineers were trying to find out, is can you use this during demolition? A lot of times what these contractors do is they use what's there, they support it sometimes, because then you're not on the water. The problem with being on the water, and the Navy just says, is that the barges go up and down with the tides. You have to make changes all the time, and it's not a stable platform. So always, marine contractors try to use the land whenever possible. And there was no prohibition that you couldn't think about that, and with these reports in their possession and not providing them, we believe that was pretty much it. I want to ask you just one question. I was looking at page JA3394, and I think this is your RDA's construction plan, and in talking about what happened before the contractors entered into it, this is the proposal, and it says, in most cases under the load of the extraction process, the pile will break between the mud line and the existing pile jacket. Does this undermine the testimony that breaking was unexpected? I think some breaking is not unexpected. Just the massive type of breaking that occurred, and then the breaking that occurred inside the ground that Regan faced, that was unexpected. But the piles would break. It's just the Appledoo report talks about 97% of the piles having 60% or less. And this refers to 60% of the piles breaking between the mud line and somewhere else. Yes. Okay. Thank you, Counselor. Thank you. Take the case under advisement. Thank you.